A.N. GEORGE, Plaintiff,

v.

MOBIL OIL CORPORATION, and
Mobil Europe, Inc., Defendants.

No. 88 Civ. 1549 (JMW).

United States District Court,
S.D. New York.

Feb. 8, 1990.

Raymond F. Gregory, New York City, for plaintiff.

James W. Gladden, Jr., Rayna Eller, Mayer, Brown & Platt, Chicago, Ill. (Mayer, Brown & Platt, Judith M. Janssen, Of-

fice of General Counsel, Mobil Oil Corp., New York City, of counsel), for defendants.

## MEMORANDUM AND ORDER

WALKER, Circuit Judge [1]:

Plaintiff alleges that Mobil Oil Corporation ("Mobil") and its subsidiary Mobil Europe, Inc. ("MEI") discriminated against him on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* and New York Executive Law § 296 (McKinney 1988). Defendants move for summary judgment, pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, the Court denies defendants' motion.

### I. *BACKGROUND*

Certain facts are not in dispute. Plaintiff A.N. George was employed by Mobil from 1968 until his termination in 1986 at the age of 62. In 1973 he became General Manager of MEI's Greek affiliate.[2] From 1978 on, plaintiff served in MEI's London headquarters as Area Executive, the third highest MEI line position, supervising four and later seven of MEI's smaller European marketing affiliates. He reported to John Simpson, Vice President of MEI, who in turn reported to P.W. Wilson, MEI President. Each year, Mobil evaluated the performance of its employees. Throughout his tenure as Area Executive, plaintiff was rated "MR+," meaning that he more than met job requirements, and received favorable comments.[3]

In the early–to–mid–1980's, the oil industry experienced economic difficulty due to a precipitous fall in prices. In response, MEI undertook a restructuring in 1985 in order to, in part, "reduce unnecessary duplication of effort ... and eliminate a level of staff management between the affiliate and the Division." D.Mem. Exh. B, p.1. Mobil made large cuts in MEI staff and rerouted certain responsibilities to either MRDI in New York or the affiliates. D.Mem. at 4. These changes affected George as Area Executive "basically in the planning area," by reducing his ability to depend upon staff assistance. George Dep. at 253. Although the 1985 reorganization was originally to be completed at year's end, in mid-August Wilson reported to Robert Swanson, Executive Vice President of MRDI, that "[by] September 1 revised communications and staff responsibilities will be in place ... [B]y September 1 we will have converted to the new operating mode." P.Exh. M.

A further restructuring was planned and ultimately implemented in 1986. The MEI offices were to be relocated to New York, and all MEI functional departments were to be eliminated and replaced by a single small, non-specialized Administration Department. Specialized staff assistance would still be available from MRDI departments, although their personnel would also be cut.

On February 26, 1986, Simpson finalized George's 1985 Appraisal of Performance. Like all George's prior appraisals as Area Executive, the 1985 evaluation praised George—calling him "a results-oriented executive"—and rated him MR+, at the time considered very good by some Mobil personnel managers, with a recommendation that he be retained in his position. P.Exhs. E, A pp. 50–52. The affiliates in his portfolio were profitable and outperforming projections. There was no negative comment or suggestion that plaintiff had trouble adjusting to the restructuring. Simpson indicated that plaintiff's "[j]ob responsibilities should be modified or expanded to provide for continuing challenge," and commented that his "[p]osition [as restructured] should continue to provide a challenge." Simpson gave George a copy of this appraisal on March 25, 1986, but did not discuss it with him. Nevertheless, Simpson later claimed

---

**1.** Sitting by designation.

**2.** MEI is one of four geographic components of Mobil's Marketing and Refining Division International ("MRDI"), which is responsible for all of Mobil's marketing and refining of petroleum outside the United States and the Middle East.

**3.** Mobil's employee performance rating system is as follows: RE (rarely equalled on performance expectations); CE (clearly exceeds job requirements); MR (meets job requirements); MM (marginally meets job requirements); FM (fails to meet job requirements).

that as of the time of the appraisal he had begun to doubt plaintiff's effectiveness under the restructuring. Simpson Dep. at 9–12, 20–30, 36.

In a memorandum to Wilson dated April 9, 1986, plaintiff detailed his progress in implementing the reorganization. The memorandum advised that "[o]n a staff basis, because of the increased delegation of authorities, we are coping," and recommended additional contact between the Planning Department and affiliates and the dedication of one planner to the needs of the seven smaller affiliates. D.Exh. D.

At a Mobil Career Development meeting held in Phoenix, Arizona on May 12–13, 1986, a recommendation by Wilson that plaintiff be replaced as Area Executive when the MEI office was moved to New York was adopted, and Wilson was directed to find a replacement. He instructed Simpson to review plaintiff and five other candidates to determine who was best qualified. Simpson employed a ranking form evaluating a number of criteria, all ostensibly free from age bias, each of which was valued numerically. P.Exh. W. Of the six, plaintiff received the lowest overall score, while Brian Davis, a younger employee and professional planner then serving as General Manager of the Portugal affiliate, scored highest. Davis subsequently became George's replacement as Area Executive. Simpson completed the ranking on or before June 6, 1986.

Paul J. Hoenmans, President of the Marketing and Refining Division, made the final decision to fire plaintiff. Hoenmans Dep. at 4. In a June 4, 1986 memorandum to Mobil's President, Hoenmans recommended separation of George and two other executives due to the restructuring. Hoenmans explained that plaintiff's prior success was predicated on the availability of "substantial staff support", and that without such support he would be hurt by his lack of "sufficient expertise in the position's substantial functions" and "analytic ability". D.Mem.Exh. I. On May 30, however, Patricia L. Arthur, Mobil Manager of

Human Relations, had circulated a "placement request" describing George as "surplus" and requesting managers having or anticipating a suitable opening for him to respond by June 6. George was then "not [yet] aware of his redundant position." P.Exh. V.

On June 17, Wilson and Simpson told plaintiff that he would be removed as Area Executive effective September 1, 1986, when MEI would move. They explained that management considered Davis better qualified for the restructured position. Plaintiff was told that he would continue to receive his salary and benefits through December 31, 1986, and that he was entitled to a $477,100 retirement benefit and a termination allowance of approximately $99,-000.

During the summer of 1986, George remained in contact with his superiors at Mobil, discussing, *inter alia*, the possibility of enhancing his retirement package with more money or a consultancy contract. George Dep. at 372–75, 385. Plaintiff claims he continually reminded them of his desire to be placed in another job commensurate with his skills and general pay level, George Aff. ¶ 48; George Dep. at 400ff, although his first written communication to this effect was a letter to Simpson on October 29. Three positions were submitted for his consideration. The one he agreed to consider, however, was ultimately unavailable.[4]

In October 1986, plaintiff inquired of the Equal Employment Opportunity Commission ("EEOC") about his termination and the release required by Mobil in connection with his termination allowance. This release, which appears in a printed form entitled "TERMINATION BENEFITS", in a section headed "Termination Allowance Benefit", states:

> The above termination allowance has been granted in connection with your termination of employment.
> This allowance is conditioned on your not having any claim against the Company by reason of termination of employment

---

4. Plaintiff also contends that Career Development papers for this post, that of General Manager of the Colombia, S.A., affiliate, prejudiced him by referring to him as scheduled to retire.

and on the company receiving assurance to this effect by your signature below. I agree to the above provisions and I accept the terms and conditions.

D. Reply Mem.Exh. D. Plaintiff was told that signing the release would have no effect on his legal rights.

On November 5, 1986, Simpson prepared and signed an Appraisal of Performance for calendar year 1986. P.Exh. BB. This appraisal was negative in tone, and gave plaintiff a grade of MR/MR−, his first lower than MR+. Simpson criticized George's strategy studies, affiliate direction and guidance, utilization of opportunities opened by the European Economic Community, oral communication skills, problem-solving and decision-making, and adaptation to MEI's restructuring, specifically over-reliance on staff. Many of these criticisms contradicted earlier assessments.

In January 1987, having been advised that no further offer of reemployment would be forthcoming, and after consulting an attorney, George accepted the retirement package, signing the release without objection.

George subsequently brought suit against Mobil and MEI seeking damages and injunctive relief alleging that his termination had been motivated primarily by his age, and was therefore in violation of the ADEA.

## II. *DISCUSSION*

Summary judgment may be granted only where, upon consideration of the available evidence, "there is no genuine issue as to any material fact ..." Fed.R.Civ.P. 56(c). Such an issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All reasonable inferences must be drawn in favor of the non-moving party and all ambiguities and differences must be resolved to its benefit. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (per curiam); *Patrick v. LeFevre*, 745 F.2d 153, 161 (2d Cir. 1984). Summary judgment is ordinarily inappropriate where intent and state of mind

are at issue. *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1988); *Meiri v. Dacon*, 759 F.2d 989, 997–98 (2d Cir.1985); *Patrick, supra* at 159. Similarly, "[r]esolution of credibility conflicts and the choice between ... conflicting versions are matters for the jury and [are] not properly decided ... on summary judgment." *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) (citations omitted); *see also Patrick*, 745 F.2d at 159–60 (circumstantial evidence challenging plaintiff's credibility only punctuates the need for full factual exposition). "It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given to their testimony can be appraised." *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962).

### A. *The Release*

Defendants claim that summary judgment is appropriate because George is barred from asserting any age discrimination claim by virtue of his signing the release of all claims arising from his termination. The Court concludes that SJ is inappropriate because a genuine issue of material fact remains as to whether plaintiff signed the release knowingly and voluntarily.

"[A]n unsupervised release of rights under the ADEA is permissible, subject to close evaluation of various factors that are indicia of a 'knowing' and 'willful' waiver." *Bormann v. AT & T Communications, Inc.*, 875 F.2d 399, 402 (2nd Cir.1989). Whether a release was knowing and willful is decided by reference to the "totality of the circumstances," a more stringent standard than "ordinary contract principles." *Bormann*, 875 F.2d at 403 (citing *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 524 (3rd Cir.1988)). The following factors are "helpful," though "not exhaustive," in applying this standard:

1) the plaintiff's education and business experience, 2) the amount of time the plaintiff had possession of or access to the agreement before signing it, 3) the role of plaintiff in deciding the terms of

the agreement, 4) the clarity of the agreement, 5) whether the plaintiff was represented by or consulted with an attorney, and 6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law. *Bormann,* 875 F.2d at 403 (quoting *Equal Employment Opportunity Commission v. American Express Publishing Corp.,* 681 F.Supp. 216, 219 (S.D.N.Y.1988) (Lasker, J.)).

■■■ Several factors here admittedly militate in favor of defendants. The language of plaintiff's waiver clearly and unambiguously releases defendants from any claims relating to his termination. Contrary to plaintiff's assertion, waiver of ADEA claims need not be specifically recited where the waiver is otherwise unambiguous.[5] *EEOC v. American Express,* 681 F.Supp. at 219; *accord Stroman v. West Coast Grocery Co.,* 884 F.2d 458, 461 (9th Cir.1989). Nor does defendants' alleged knowledge at the time of the release that plaintiff had an age-related grievance shield these claims from waiver. Plaintiff's claims fall well within the scope of the release, which is limited only to "any claim against the Company by reason of termination of employment."[6] The agreement is also clear in its requirement that plaintiff waive his right to sue defendants as a condition of receiving his termination benefits.

Moreover, plaintiff is a well-educated, sophisticated businessman, undoubtedly well acquainted with agreements of this sort. Plaintiff had the Termination Benefits form in his possession for a matter of months, ample time for him to carefully review it and consider its consequences.

■■■ Other factors, however, raise factual questions as to plaintiff's voluntariness. Plaintiff had no role in deciding the terms of the release, which was contained in a printed form and was tied to a predetermined, non-negotiable termination allowance. While lack of opportunity to negotiate the terms of an agreement does not by itself require a trial on voluntariness where other indicia show an awareness by plaintiff of the rights he was surrendering, it may serve as one of several factors warranting denial of summary judgment. *Bormann,* 875 F.2d at 403 and n. 1 at 403. Additionally, although plaintiff consulted an attorney regarding the release, that attorney neither participated in negotiating the agreement nor was present when plaintiff signed it. As in *EEOC v. American Express,* plaintiff's "attorney advised him that the agreement was not binding, a factor which, though not chargeable to [defendants], may be relevant in determining [plaintiff]'s voluntariness in signing." 681 F.Supp. at 220.

Moreover, it is by no means clear that "the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled." *Id.* at 219; *Bormann,* 875 F.2d at 403. A bulletin in defendants' "Mobil Benefits News" of May 27, 1986 outlines enhanced benefits for terminated employees. Included is a formula for determining the allowance for such employees, with no mention of this allowance being conditional upon any release. Wilson's memorandum to plaintiff of June 17, 1986, confirming their discussion regarding plaintiff's retirement, also sets out the termination allowance without mention of release as a precondition. *Cf. Bormann,* 875 F.2d at 400 (Termination Payment Plan included two options, the more lucrative of which was clearly contingent on a release of all claims by the employee). These omissions, together with the other remaining questions, raise a genuine issue of material fact about

---

**5.** This is not one of those releases which "suffer from the ambiguity ... where the release refers, not to causes of action, but to compensation practices, benefits, or rights to remuneration, thereby creating confusion whether the release covers ADEA claims." *EEOC v. American Express Publishing Corp.,* 681 F.Supp. 216, 219 n. 5 (S.D.N.Y.1988) (citations omitted).

**6.** Although the facts alleged might have supported some other claim or claims, those are not now before the Court. We therefore need not decide whether such claims are separable from the termination claim, or whether viewing those claims separately would amount to improper "hairsplitting", as defendants assert.

the voluntariness of the release sufficient to defeat summary judgment.[7]

### B. *The Age Discrimination Claims*

Plaintiff alleges that defendants fired him because of his age, and thereby violated the ADEA. That statute provides that

It shall be unlawful for an employer— (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.

29 U.S.C. § 623(a). As a "person aggrieved," plaintiff has standing to assert a civil action under the statute. 29 U.S.C. § 626(c)(1).

■ In adjudicating ADEA claims, courts have applied the three-step analysis laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973), for Title VII race discrimination cases. *See, e.g. Haskell v. Kaman Corp.*, 743 F.2d 113 (2d Cir.1984); *see also Pena v. Brattleboro Retreat*, 702 F.2d 322, 324 (2d Cir.1983). The burden of proof in all such employment discrimination cases is initially on the plaintiff to raise a *prima facie* case of discrimination. The defendant may then counter by asserting a legitimate, non-discriminatory reason for the allegedly discriminatory act. The burden finally rests with the plaintiff to show "that the proffered reason was not the true reason for the decision ... Plaintiff [must show] the court that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); (citing *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. at 1825–26 (1973)). Plaintiff need not demonstrate that age was the sole reason for discharge, only that it made a difference. *Montana v. First Federal S. & L. of Rochester*, 869 F.2d 100, 105 (2d Cir.1989) (citing *Hagelthorn v. Kennecott Corp.*, 710 F.2d 76, 82 (2d Cir.1983)).

The only issue presently before the Court is plaintiff's claim of pretext. Defendants have conceded *prima facie* discrimination under the *McDonnell/Burdine* standard for the purposes of this motion. Plaintiff has not challenged the accuracy of defendants' proffered legitimate reason, namely that his replacement was better qualified for the Area Executive position as restructured in 1985 and 1986. Plaintiff must therefore raise a genuine issue of material fact as to whether defendants' stated legitimate reasons for his dismissal are a mere pretext in order to defeat summary judgment. The Court finds that plaintiff has met this burden.

■ Defendants claim that plaintiff was dismissed from his job because he relied too heavily upon professional staff support and lacked certain necessary skills, notably in the area of planning, to be able to perform effectively the new Area Executive function. However, plaintiff's positive 1985 appraisal appears to have covered a period of at least three months in which plaintiff operated under the new order, with no mention of these supposedly fatal shortcomings.[8] Simpson's claim that he had already begun to question plaintiff's performance under the restructuring, but nevertheless refrained from mentioning these doubts because he felt it unfair to

---

**7.** Defendants contend that plaintiff is barred from raising the question of additional consideration by his deposition testimony that he signed the form believing that otherwise he would not receive the benefit. If anything the contrary is true. Plaintiff's deposition testimony goes only to his state of mind at the time of signing, but says nothing about what his actual legal rights were, the relevant inquiry here. Rather, such a discrepancy between plaintiff's actual rights and his understanding of those rights at the time he signed the form would tend to favor a finding that the release was not knowing and voluntary.

**8.** There is no indication on the form that it evaluated anything less than a full year's performance. Moreover, it is unclear whether an appraisal dated February 26 of the following year would not, according to company policy, have referred to performance up to the date of completion. If so, the appraisal might arguably have covered a period of five months under the restructuring.

judge on so short a period of time, is unsupported by any evidence predating the instant claim. Simpson's contention, therefore, cannot, without a credibility determination inappropriate on summary judgement, overcome the inference favorable to plaintiff that plaintiff's performance was satisfactory even after the reorganization of MEI. This inference would tend to show "that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

There also remains a genuine issue of material fact regarding the extent to which the restructured position required skills which plaintiff lacked. Plaintiff has conceded that the reorganizations required the Area Executive to do more himself, particularly in the area of strategic planning, with less staff assistance. However, evidence supports the contention that the restructured, New York based Area Executive relied extensively on professional staff, albeit MRDI staff instead of the defunct MEI departments, in planning and other areas. Dunn Dep. at 9–14. Davis' testimony that he took on nearly all planning work himself may, therefore, reflect more his own propensity as a professional planner than actual job requirements. *See* Davis Dep. at 81–83.

There is, moreover, no prior indication of any deficiency in plaintiff's planning skills. This is remarkable in light of the Area Executive Position Description, which clearly assigns high priority to the functions of planning business strategy and establishing short- and long-term operating and financial objectives for affiliates.[9] A jury could thus infer, in support of a finding of pretext, that the change in plaintiff's position cannot adequately or credibly account for the decision to fire him.

Nor is there any evidence, with the exception of the 1986 Appraisal of Performance, that plaintiff was incapable of adjusting to the new environment. That doc-

ument remains suspect, not only because it was created after plaintiff's dismissal, but because it reversed all of his prior evaluations. *See Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108 (3d Cir.1988).

The timing and lack of demonstrable objectiveness of Simpson's ranking of candidates also tends to support an inference of pretext. The inclusion of plaintiff in this exercise after the recommendation to separate him was adopted suggests that his dismal rating may have been a foregone conclusion. This inference is reinforced by Mobil personnel managers' testimony that the ranking form used was unprofessional, highly subjective, and susceptible to self-justifying distortion. Devan Dep. at 75–76; MacKenzie Dep. at 62–63. Particularly suspect is the item concerning skills particular to the position and replaceability by other employees. Plaintiff received the lowest possible rating, despite the fact that, of the six candidates, only he had any experience as Area Executive. Defendants' proffered explanations of the ranking procedure again depend upon credibility determinations which the Court may not now make. There is, therefore, a genuine issue of material fact as to whether the ranking was merely pretextual.

Having concluded that genuine issues of material fact exist to be tried, the Court need not consider each of plaintiff's remaining allegations. Defendants have failed to meet their burden under the summary judgment standard.

### III. CONCLUSION

Accordingly, defendants' motion for summary judgment is denied in its entirety. SO ORDERED.

---

9. The functions and responsibilities of each position at Mobil is formalized in a Position Description, which "should be rewritten whenever significant changes in responsibilities occur." P.Exh. O. Plaintiff points out that no official revision of the Area Executive Position Descrip-

tion has been adopted either during or since the reorganizations of MEI, and that even a draft revision prepared by Davis at Simpson's behest reflected no change in the substance or priority of planning-related functions.